Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 1 of 68   PageID #: 20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
CONTINUED INTERCEPTION OF WIRE
AND ELECTRONIC COMMUNICATIONS
TO AND FROM SPRINT CORP.
CELLULAR NUMBER (304) 579-0270 **(TT2)**

*3:19mc43*

UNDER SEAL

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Jeffrey Cisar, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

1.     I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a Special Agent with the Federal Bureau of Investigation (FBI) since September 2004. I have received basic drug, gang, and criminal enterprise investigative training at the FBI Training Academy located in Quantico, Virginia. I am currently assigned to the FBI Pittsburgh Division, specifically to the Eastern Panhandle Drug and Violent Crimes Task Force (EPD&VCTF) in Martinsburg, West Virginia. Prior to my current assignment, I was assigned to the FBI Counterterrorism Unit and to the FBI Baltimore Division where I investigated drug and violent crime matters.

3.     I have been serving in the capacity of EPD&VCTF coordinator for approximately six years. My current assignment requires extensive knowledge of matters related to illegal drug trafficking and violent gang activity in the

1

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 2 of 68   PageID #: 21

Eastern Panhandle of West Virginia. As part of my duties as a Special Agent, I investigate criminal activity related to drug trafficking, in violation of 21 U.S.C. § 841(a)(1).   My experience includes, but is not limited to, conducting surveillance, interviewing witnesses, conducting database checks, analyzing telephone records, writing affidavits for search warrants, executing search warrants, and working with undercover agents and informants.  I am familiar with matters including, but not limited to, the means and methods used by drug trafficking organizations to purchase, transport, store, and distribute drugs, and the concealing of profits generated from those transactions.  Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who distribute drugs.  I know that it is common practice for drug traffickers to routinely utilize telephones, mobile phones, prepaid phones, calling cards, public telephones, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement. Moreover, it is not unusual for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual.  The individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the concealment of proceeds derived from the sale of controlled substances.   Furthermore, I have extensive experience in Title III investigations having served as a case agent and Title III affiant in multiple EPD&VCTF cases.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 3 of 68   PageID #: 22

## PURPOSE OF AFFIDAVIT

4.  This Affidavit is being submitted in support of an application for an order authorizing the continued interception of wire communications, including any voicemail messages intercepted as they are contemporaneously left or retrieved, and the interception of electronic communications including, but not limited to, text messages of SHAQUAN RICHARDSON, THEODORE RICHARDSON, BRAHEEM GILBERT, ALVIN GILBERT, VALERIA VINCENT, ASHLEY HESS, CHRISTOPHER MOSBY, JUSTIN JENKINS, ARMSTEAD CRAIG, BONI FACIO ARAMBURO, KEVIN YOUNG, MEDO HALLACK and other persons as yet unknown ("TARGET INTERCEPTEES") occurring to and from the following cellular telephone:

   a.  Cellular telephone bearing the number (304) 579-0270, and accessed through International Mobile Subscriber Identity (IMSI) number 310120058809710 ("TARGET TELEPHONE 2" or (TT2)), no subscriber name and subscriber address of 176 Lee St., Martinsburg, WV 25404, serviced by Sprint Corp. and used by SHAQUAN RICHARDSON.

5.  TT2 is being utilized by RICHARDSON for offenses involving violations of 18 U.S.C. § 2516; namely violations of 21 U.S.C. § 841, 21 U.S.C. § 843(b), 21 U.S.C. § 846, and 18 U.S.C. § 1952 (the "TARGET OFFENSES").

6.  The authorization given applies to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through that target telephone number referenced above, within the thirty-day period. The authorization is also intended to apply to the target telephone number referenced above regardless of service provider(s), and to background

conversations intercepted in the vicinity of the target telephone while the telephone are off the hook or otherwise in use.

7.  As a result of my personal participation in this investigation and reports made to me by other law enforcement officers and information obtained from confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this Affidavit show that there is probable cause to believe that SHAQUAN RICHARDSON, THEODORE RICHARDSON, BRAHEEM GILBERT, ALVIN GILBERT, VALERIA VINCENT, ASHLEY HESS, CHRISTOPHER MOSBY, JUSTIN JENKINS, ARMSTEAD CRAIG, BONI FACIO ARAMBURO, KEVIN YOUNG, MEDO HALLACK ("TARGET SUBJECTS"), and others as yet unknown, have committed, are committing, and will continue to commit violations of:

    a.   21 U.S.C. § 841 – Possession with the intent to distribute and distribution of a controlled substance, namely heroin, Phencyclidine (PCP), and cocaine base;

    b.   21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony-controlled substance offense;

    c.   21 U.S.C. § 846 – Conspiracy to possess with the intent to distribute and to distribute controlled substances; and

    d.   18 U.S.C. § 1952 – Interstate travel in aid of unlawful activity.
(collectively the "TARGET OFFENSES.")

8.  Additionally, based upon the investigation in this case, there is probable cause to believe the following:

    a.   SHAQUAN RICHARDSON is using **TT2** in connection with the commission of the TARGET OFFENSES;

4

b.  particular wire and electronic communications of the TARGET INTERCEPTEES and others as yet unknown, concerning the TARGET OFFENSES will be obtained through the continued interception of wire and electronic communications occurring to and from TT2; and,

c.  the communications will likely identify and provide admissible evidence concerning:

    i.  the TARGET OFFENSES;

    ii.  the names, telephone numbers, and residences of associates of the Target Subjects, and others as yet unknown, including their drug supplier;

    iii.  the leadership of the drug trafficking organization;

    iv.  the dates, times, and places for commission of the illegal activities including drug distribution, and other related gang activity;

    v.  the location, receipt, administration, control, management, and disposition of United States currency, illegal narcotics, and assets to include business, vehicles, and items purchases with funds gained through the distribution of narcotics;

    vi.  the nature, scope, places, and methods of operation; and,

    vii.  the existence and location of records documenting the distribution of narcotics and gang related activities.

9.  Normal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 6 of 68   PageID #: 25

10. On August 27, 2019, authorization to intercept voice and electronic communications occurring over **TT2** was obtained in the Northern District of West Virginia (3:19-MC-33). Interceptions began on 08/27/2019 and are currently authorized to continue until 09/26/2019. Your affiant is requesting the affidavit approved during the authorization of 3:19-MC-33 be incorporated into this instant affidavit. This affidavit serves to support the need for continued interception of **TT2** for an additional 30-day period.

## BASIS OF INFORMATION

11. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a.   my experience investigating narcotics trafficking and gangs and criminal organizations;

    b.   oral and written reports, and documents about this investigation that I have received from members of the Federal Bureau of Investigation, local law enforcement, and other federal law enforcement agencies;

    c.   discussions I have had personally concerning this investigation with experienced criminal enterprise investigators;

    d.   physical surveillance conducted by the Federal Bureau of Investigation and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e.   public records;

    f.   telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    g.   precise location data received from search warrants;

    h.   statements of confidential sources;

    i.   consensually-recorded meetings and phone calls over **TT2**;

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 7 of 68   PageID #: 26

j.    controlled purchases of heroin and crack cocaine from subject SHAQUAN RICHARDSON; and

k.    Intercepted voice and electronic communications occurring over **TT2** as authorized in the Northern District of West Virginia (3:19-MC-33) on 08/27/2019.

12.    In addition to the foregoing, I specifically relied on oral reports/opinions from other law enforcement officers.

13.    Since this Affidavit is being submitted for the limited purpose of securing authorization for the continued interception of wire and electronic communications, I have not included each and every fact known to me concerning this investigation or every aspect of the investigation to date.  I have set forth only the facts that I believe are necessary to establish the foundation for probable cause for an order authorizing the interception of wire and electronic communications.

## TARGET SUBJECTS/TARGET INTERCEPTEES

14.    Information about the TARGET SUBJECTS/TARGET INTERCEPTEES comes from the following sources and criminal indices:  Confidential informant (CI) debriefings, law enforcement controlled narcotics purchases, physical surveillance conducted by law enforcement officers, information queries conducted through law enforcement databases and through commercial and public databases, through telephone records obtained via administrative subpoena, and authorized interception of voice and electronic communications occurring over **TT2**.  Through a review of that information, the following persons have been identified:

a. SHAQUAN RICHARDSON, also known as "Wave" (herein referred to

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 8 of 68   PageID #: 27

as RICHARDSON) has been identified by law enforcement officers to utilize telephone number 304-579-0270 (**TT2**). RICHARDSON previously utilized telephone number 571-465-6400 (referred to in this affidavit as **TT1**). RICHARDSON is known to be residing in Jefferson County, West Virginia. RICHARDSON has a date of birth of          1996, social security number of XXX-XX-9917, and FBI#: 190991CE0.   RICHARDSON's criminal history reflects multiple arrests for drug possession and distribution. He was convicted of misdemeanor drug possession in April 2016. In December 2017, RICHARDSON was arrested in Martinsburg, WV on charges of 1st Degree Robbery, Malicious Assault/Wounding, and Abducting a person with intent to defile. The captioned charges stemmed from an incident in which RICHARDSON allegedly held an individual against his/her will and then shot the individual.   RICHARDSON pled guilty to making threats to kidnap or demand ransom and wanton endangerment with a firearm.   The EPD&VCTF conducted multiple controlled purchases of heroin and crack cocaine from RICHARDSON over **TT1** and **TT2** which are further detailed later in this affidavit. Investigators are aware from telephonic contact with Verizon Corporate Security officials that RICHARDSON's use of **TT1** ended at the beginning of August 2019.   Verizon specifically advised that service was discontinued on or around July 27, 2019 by RICHARDSON.

b. BRAHEEM GILBERT (herein referred to as BRAHEEM) has been identified by law enforcement officers to be utilizing telephone number 304-261-1662 (herein referred to as "Conspirator Phone 2" or (CP2). BRAHEEM was known to be residing in Berkeley County, West Virginia. BRAHEEM has been confirmed to be the user of CP2 by way of multiple EPD&VCTF controlled drug buys, further detailed in this affidavit, facilitated over CP2 with BRAHEEM.   BRAHEEM has a date of birth of          .989, social security number of XXX-XX-3444, and FBI#:

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 9 of 68   PageID #: 28

992126WC7.   BRAHEEM's criminal history reflects multiple felony convictions related to unlawful possession of a handgun, CDS possession, and Aggravated Assault.   His most recent felony conviction for CDS possession occurred in February 2014.   His most recent felony conviction for aggravated assault with a weapon occurred in July 2014.   The captioned conviction for aggravated assault resulted in a four-year sentence of incarceration in state prison.   BRAHEEM was released from prison in January 2017.   The EPD&VCTF conducted a controlled purchase of heroin and crack cocaine from BRAHEEM on 06/20/2019 and again on 07/28/2019, which is detailed later in this affidavit.

c. ALVIN GILBERT (herein referred to as ALVIN) is currently incarcerated at the Eastern Regional Jail in Martinsburg, WV.  Prior to his arrest, ALVIN was known to be utilizing 681-247-9111 (herein referred to as "Conspirator Phone 6" or (CP6)). CP6 was confirmed to belong to ALVIN at the time of his arrest on February 7, 2019 as further detailed later in this affidavit.  ALVIN was arrested by the EPD&VCTF for a drug related homicide which occurred on February 3, 2019 in Martinsburg, WV.   Prior to his arrest, on January 31, 2019, the EPD&VCTF conducted two controlled purchases of Fentanyl and crack cocaine.  ALVIN has a date of birth of       1992, social security number of XXX-XX-7985, and FBI#: 718669LC9.   ALVIN's criminal history reflects multiple felony arrests (dispositions unknown) related to possession with intent to distribute narcotics.  Additionally, ALVIN has multiple arrests for unlawful possession of a handgun.   ALVIN was arrested in February 2019 for first degree murder, a charge associated with a drug-related homicide which occurred on or around the time that the EPD&VCTF was conducting controlled purchases of narcotics from ALVIN.  The captioned controlled drug buys are further detailed later in this affidavit.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 10 of 68   PageID #: 29

d. THEODORE RICHARDSON (herein referred to as THEODORE) has been identified by law enforcement officers to be utilizing telephone number 304-482-8131 (herein referred to as "Conspirator Phone 7" or (CP7)). CP7 has been confirmed to be in the possession of THEODORE. Officers confirmed this through a controlled heroin buy conducted by the EPD&VCTF from THEODORE which was facilitated over CP7 and observed to be utilized by THEODORE. THEODORE is known to be residing in Berkeley County, West Virginia. THEODORE has a date of birth of      1964, social security number of XXX-XX-0317, and FBI#: 496985DA2. THEODORE's criminal history reflects multiple felony convictions in West Virginia and New Jersey related to burglary, drug distribution, drug possession, and unlawful possession of weapons. His most recent felony drug conviction related to heroin possession and distribution in New Jersey occurred in May 2000. His most recent West Virginia felony drug conviction for cocaine distribution occurred in 2014. The EPD&VCTF conducted a controlled purchase of heroin and crack cocaine from THEODORE on 06/20/2019 and again on 07/28/2019, which is further detailed later in this affidavit.

e. VALERIA VINCENT (herein referred to as VINCENT) has been identified by law enforcement officers as a target subject of this investigation and is the girlfriend of ALVIN. VINCENT is known to be residing in Berkeley County, West Virginia. VINCENT has a date of birth of      1987 a social security number of XXX-XX-4244, and FBI# 922933JC9. VINCENT has multiple felony drug distribution arrests in West Virginia, New York, and Maryland. Additionally, VINCENT has a federal conviction in the Northern District of West Virginia for drug distribution in 2011 and was sentenced to approximately five years of federal incarceration. The EPD&VCTF made a controlled purchase of

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 11 of 68   PageID #: 30

$100 worth of heroin from VINCENT on February 8, 2019 and arrested her immediately following the controlled drug buy. VINCENT was interviewed subsequent to the arrest. VINCENT did not reveal her source of drug supply nor identify the hierarchy of the drug trafficking organization she was a part of. VINCENT's interview yielded information which supported ALVIN's involvement in a drug-related homicide that occurred on February 3, 2019 and is detailed later in this affidavit.

f. CHRISTOPHER MOSBY (herein referred to as MOSBY) has been identified by law enforcement officers to be utilizing telephone number 304-995-1968 (herein referred to as "Conspirator Phone 1" or (CP1)). MOSBY and ASHLEY HESS are in a relationship and are known to be living together in a trailer located in Berkeley County, WV. MOSBY has a date of birth of      1969, social security number of XXX-XX-7745, and FBI#: 416363NB1. MOSBY's criminal history reflects arrests related to drug possession in the Northern District of West Virginia. In February 2014, the EPD&VCTF executed a search on a motel room in Berkeley County, WV after obtaining information related to a heroin overdose that was associated to a dealer using the hotel room. Upon execution of the search warrant, MOSBY was determined to be an occupant of the room. Officers located a loaded handgun, marijuana, several empty baggies of heroin, and heroin use paraphernalia. Mosby was charged by the EPD&VCTF with drug possession. While continuing to develop the investigation, approximately two weeks after the aforementioned search warrant, MOSBY was arrested by the WVSP and later convicted for kidnapping and domestic battery. An administrative subpoena issued to Sprint Corp. revealed CP1 to be subscribed to by CHRIS MOSBY residing at his associated address in Berkeley County, WV.

g.  ASHLEY HESS (herein referred to as HESS) has been identified by law enforcement officers to be utilizing telephone number 304-820-6254 (herein referred to as "Conspirator Phone 12" or (CP12)) and 304-820-6452 (herein referred to as "Conspirator Phone 13" or (CP13)). HESS has also been known by investigators to utilize MOSBY's phone (CP1) due to the fact that HESS and MOSBY are in a relationship and live in the same residence.  HESS is known to live with MOSBY in a trailer located in Berkeley County, West Virginia.  HESS has a date of birth of        1989, social security number of XXX-XX-2092, and FBI#: 368829WD4.  HESS's criminal history reflects arrests related to heroin possession in the District of Maryland and fraud and larceny in the Northern District of West Virginia.  On 06/12/19, the EPD&VCTF placed a controlled "spoof" telephone call to CP1.  The call was answered by a female voice, positively identified as HESS.  This positive identification was made by EPD&VCTF investigators spoke to HESS on multiple occasions and are familiar with her voice both in person and on the telephone.  An administrative subpoena issued to Sprint Corp. revealed CP12 to be subscribed to by ASHLEY HESS residing at her associated address in Berkeley County, WV.  Utility records for HESS list CP13 as HESS's contact telephone number.  On 08/12/2019, the EPD&VCTF utilized CI-43 to successfully conduct a controlled purchase of cocaine and heroin, from HESS which is further detailed later in this affidavit.

h.  ARMSTEAD CRAIG (herein referred to as CRAIG) is currently incarcerated at the Eastern Regional Jail in Martinsburg, WV. CRAIG was arrested in January 2019 after being federally indicted in the Northern District of West Virginia for conspiracy and heroin distribution.  CRAIG was a target subject of a previous EPD&VCTF investigation in which investigators sought and obtained authority in the Northern District of West Virginia (3:18MJ103) to intercept voice

12

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 13 of 68   PageID #: 32

and electronic communications occurring over CRAIG's identified cell phone.   Additional arrests and convictions present in CRAIG's criminal history include but are not limited to a 1999 conviction for brandishing and carrying a firearm without a license, and a federal conviction in 2001 for crack cocaine distribution resulting in a 188-month federal prison sentence.   CRAIG was released on probation in 2011 and violated the terms of his probation in May 2011.  He served an additional four months of incarceration until he was arrested by the EPD&VCTF in January 2019 as noted earlier.   CRAIG has a date of birth of        1979, social security number of XXX-XX-9723, and FBI#: 493841MB9.

i.      BONI FACIO ARAMBURO (herein referred to as ARAMBURO) has been identified by the EPD&VCTF as a drug supplier/distributor to multiple individuals in the Eastern Panhandle of West Virginia. ARAMBURO has a criminal history reflecting arrests for possession with intent to distribute narcotics, illegal possession of a firearm, and felony manslaughter.   During an EPD&VCTF investigation conducted in the Summer of 2018 through Spring of 2019, authority to intercept wire and electronic communications occurring over cellular telephones being used by CRAIG in the Northern District of West Virginia (3:18MJ103) was sought and obtained.   Intercepted communications between CRAIG and ARAMBURO and between CRAIG and JENKINS revealed that ARAMBURO utilized JENKINS as his driver and drug "tester" as evidenced in intercepted telephone calls on 11/15/18 and 12/11/18.   Additionally, on 04/08/19, the EPD&VCTF conducted a controlled purchase of heroin from ARAMBURO, and JENKINS drove ARAMBURO to the drug transaction.  ARAMBURO has a date of birth of        1984, social security number of XXX-XX-0393, and FBI#: 59952JC3.

13

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 14 of 68   PageID #: 33

j.   JUSTIN JENKINS (herein referred to as JENKINS) has been identified by law enforcement officers to be utilizing telephone number 304-240-7309 (herein referred to as "Conspirator Phone 4" or (CP4)).   While monitoring CRAIG's intercepted wire and electronic communications in 3:18-MJ-103, officers intercepted communications between CRAIG and JENKINS wherein JENKINS used CP4. Specifically, the EPD&VCTF intercepted a call on 01/03/19 between CRAIG (240-586-3412) and JENKINS (CP4).   During the call, JENKINS advised that ARAMBURO had an outstanding warrant and JENKINS was willing to help ARAMBURO by providing a place that he could stay and not be located by authorities.   JENKINS further advised that he would be able to provide ARAMBURO with another telephone.   JENKINS is known to be residing in Jefferson County, West Virginia.   JENKINS has a date of birth of    1987 and a social security number of XXX-XX-8800.   JENKINS does not have a criminal history.   During an EPD&VCTF investigation conducted in the Summer of 2018 through the Spring of 2019, authority to intercept voice and electronic communications occurring over cellular telephones being used by CRAIG in the Northern District of West Virginia (3:18MJ103) was sought and obtained. Intercepted conversations between CRAIG and ARAMBURO and between CRAIG and JENKINS revealed that ARAMBURO utilized JENKINS as his driver and drug "tester" as evidenced in intercepted

14

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 15 of 68   PageID #: 34

telephone calls on 11/15/18 and 12/11/18.  Specifically, an intercepted call between CRAIG and ARAMBURO on 11/15/2018 revealed CRAIG warning ARAMBURO by stating, "You can't go shopping with anybody man I don't give a fuck...where ever you at.  You'll get some shit then that then these niggers don't answer they phone anymore so you gonna be stuck with it. Then you gonna be pissed."  CRAIG was warning ARAMBURO about purchasing heroin from a new supplier with out first having the quality tested.  ARAMBURO responded "That's why I said I ain't got no choice but to take Justin with me. Try this shit out, shit. Try this shit out you know I mean? No good we out. Fuck it. I had that nigger out, I had I had him I had him thirsty the whole the whole time we was up there." ARAMBURO is referring to JENKINS as "Justin" and advising that he had JENKINS test the heroin prior to obtaining the new supply.  An intercepted call between CRAIG and ARAMBURO on 12/25/2018 revealed ARAMBURO advising to CRAIG that he had recently resupplied with heroin and was waiting to tell CRAIG about the quality until he had JENKINS test the product.  Specifically, ARAMBURO stated, "I said I went up there last night. I ain't want to say nothing until I got the uh..to to Justin? down here and shit yo. Yeah shit some gasoline."  ARAMBURO is advising that the quality is good, "gasoline." CRAIG responds by asking ARAMBURO, "Oh how much you paid?"  ARAMBURO responds, "Man that bitch ass nigga

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 16 of 68   PageID #: 35

yo he try go, he tried to go up to mother fucking damn near 7 I said I'm good yo. I saw that, what what the fuck he say man cranky ass what the fuck I told you he said that day." The captioned 12/25/18 intercepted conversation further reveals JENKINS role as the "tester" for CRAIG and ARAMBURO's heroin trafficking organization. Additionally, on 04/08/19, the EPD&VCTF conducted a controlled purchase of heroin from ARAMBURO, and JENKINS drove ARAMBURO to the drug transaction.

k.  MEDO HALLACK (herein referred to as HALLACK) has been identified by law enforcement officers as a target subject of this investigation after a local search warrant was executed on September 5, 2019 at a residence in Berkeley County, WV that was being utilized by HALLACK during drug transactions with HESS that are further described later in this affidavit. HALLACK has a date of birth of .989 a social security number of XXX-XX-1324, and has been identified as a legal permanent resident (LPR) of the United States originating from Sierra Leon. HALLACK does not have a criminal history that reflects drug arrests or convictions. During EPD&VCTF controlled cocaine purchases made by CI-43 from HESS on August 12, 15, 27, 29, and September 4, 2019, HESS was monitored by EPD&VCTF surveillance officers as she traveled from her residence in Berkeley County, WV to a residence located at 10 Midshipmans

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 17 of 68   PageID #: 36

Drive, Inwood, WV.   During HESS's observed travels, CI-43 was present and able to confirm her purpose for travel, which was to obtain powder cocaine from an individual, later identified as HALLACK, at the Midshipmans Drive residence.   HESS obtained cocaine from HALLACK in order to provide CI-43 with cocaine which was ordered on behalf of the EPD&VCTF during controlled drug purchases.   In an effort to identify Hess's cocaine supplier (later confirmed to be HALLACK), the EPD&VCTF sought and obtained a state search warrant which was issued by the Berkeley County (WV) Magistrate Court on 09/04/2019.   The search warrant was also obtained by the EPD&VCTF in an effort to prevent an apparent planned robbery of HALLACK by HESS and RICHARDSON as evidenced in intercepted communications over **TT2** which are detailed later in this affidavit.   On 09/05/2019, members of the EPD&VCTF along with uniformed members of the Martinsburg Police Department and Berkeley County Sheriff's Office attempted to execute the search warrant on 10 Midshipmans Drive, Inwood, WV.   After knocking, clearly announcing a law enforcement presence and their purpose at the residence, and waiting a reasonable amount of time, officers made entry into the residence and were encountered by HALLACK who fired multiple shots from a semi-automatic handgun at the searching officers.   After an extended period of barricade by HALLACK, he

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 18 of 68   PageID #: 37

eventually surrendered to officers and was arrested by the Berkeley County Sheriff's Office for attempted murder of police officers.

l.   KEVIN YOUNG (herein referred to as YOUNG) has been identified by law enforcement officers as a target subject of this investigation after his arrest on 09/13/2019 subsequent to coordinating with RICHARDSON to transport approximately one (1) gallon of liquid Phencyclidine (PCP) from RICHARDSON's residence to an unknown location. The captioned arrest is further detailed later in this affidavit. YOUNG was identified by the EPD&VCTF as utilizing cellular telephone number 202-389-8138 (herein referred to as conspirator phone 16 or CP16). YOUNG has a date of birth of 1966, a social security number of XXX-XX-7266, and an FBI number of 334441PD6. YOUNG has a criminal history reflecting arrests for burglary, theft, and CDS possession. In March 2017, YOUNG pled guilty to theft in excess of $100,000 and received a five-year sentence of which all but two days were suspended. YOUNG was given three (3) years of supervised probation and was under the supervised probation at the time of his arrest on 09/13/2019.

## PRIOR APPLICATIONS

15.   On August 20, 2019, the electronic surveillance indices of the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Department of Homeland Security/Homeland Security Investigations were checked. There have been no prior applications seeking court authorization to intercept the wire, oral, or electronic communications of the TARGET SUBJECTS/TARGET INTERCEPTEES or involving the TARGET TELEPHONE, other than the following:

a. On 11/06/2018, the United States District Court for the Northern District of West Virginia issued an order (3:18-MJ-103) authorizing the interception of wire and electronic communications to and from a cellular telephone bearing the number 240-586-3412, used by ARMSTEAD CRAIG. Interceptions terminated on 12/05/2018. CRAIG, ARAMBURO, and JENKINS, TARGET SUBJECTS in the instant investigation, were intercepted over the phone.

b. On 08/27/2019, the United States District Court for the Northern District of West Virginia issued an order (3:18-MJ-33) authorizing the interception of wire and electronic communications to and from **TT2**. Your affiant is requesting the affidavit approved during the authorization of 3:18-MJ-33 be incorporated into this instant affidavit. Voice and electronic interception of **TT2** began on 08/27/2019 and is scheduled to terminate on 09/26/2019.

## SOURCES OF INFORMATION

15. Special Agents of the Federal Bureau of Investigation and local officers have received information concerning the illegal drug trafficking activities of members of the drug trafficking organization ("DTO").

16. CI-19:   Confidential Informant "19" (CI-19) began cooperating with the EPD&VCTF in January 2019 and providing information regarding the instant investigation. CI-19 was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter. CI-19 provided the EPD&VCTF with information regarding target subjects of a drug trafficking organization (DTO), specifically target subjects ALVIN and VINCENT. The information provided by CI-19 was corroborated through consensually monitored communications made with target subjects ALVIN and VINCENT through controlled purchases of narcotics made from ALVIN and

VINCENT.  CI-19 has a juvenile delinquency record reflecting criminal acts that do not include deception-related offenses.   CI-19 has an adult criminal history reflecting criminal acts including drug paraphernalia and drug possession.   CI-19's adult criminal history does not include deception-related offenses.  Information provided to the EPD&VCTF by CI-19 was determined to be gleaned from first-hand interaction with target subjects of this investigation. Within the context of the information provided by CI-19, which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

17.  CI-FORTY:   Confidential Informant "FORTY" (CI-FORTY) began cooperating with the EPD&VCTF in April 2019 and providing information regarding the instant investigation.   CI-FORTY was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter.  CI-FORTY provided the EPD&VCTF with information the drug trafficking organization (DTO) in this instant investigation.  CI-FORTY provided information regarding target subject SHAQUAN RICHARDSON (RICHARDSON) and yet to be fully identified target subjects in West Virginia and New Jersey that were associated with this DTO.  The information provided by  CI-FORTY  was  corroborated  through  consensually  monitored communications made with RICHARDSON and through controlled purchases of narcotics made from RICHARDSON.   CI-FORTY's adult criminal history relates to drug possession and distribution.  CI-FORTY's adult criminal history does  not  include  deception-related  offenses.   Information  provided  to  the EPD&VCTF by CI-FORTY was determined to be gleaned from first-hand interaction with target subjects of this investigation and through conversations with individuals familiar with target subjects of this investigation. Within the context of the information provide by CI-FORTY which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 21 of 68   PageID #: 40

18.    CI-BLUE:  Confidential Informant "BLUE" (CI-BLUE) began cooperating with the EPD&VCTF in June 2019 and providing information regarding the instant investigation.  CI-BLUE was motivated to cooperate and provide assistance to law enforcement authorities for consideration in a pending criminal matter.  CI-BLUE provided the EPD&VCTF with information about the drug trafficking organization (DTO) in this instant investigation.   CI-BLUE provided information regarding BRAHEEM, THEODORE, and yet to be fully identified target subjects in West Virginia and New Jersey that were associated with this DTO.   The information provided by CI-BLUE was corroborated through consensually monitored communications made with target subjects in this investigation and through controlled purchases of narcotics made from target subjects in this investigation.  CI-BLUE's adult criminal history relates to drug possession and distribution.  CI-BLUE's adult criminal history does not include deception-related offenses.   Information provided to the EPD&VCTF by CI-BLUE was determined to be gleaned from first-hand interaction with target subjects of this investigation and through conversations with individuals familiar with target subjects of this investigation.  Within the context of the information provide by CI-BLUE, which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

19.    CI-43:   Confidential Informant "43" (CI-43) began cooperating with the EPD&VCTF in 1999, and CI-43 recently began providing information regarding the instant investigation.   CI-43 was originally motivated to cooperate and provide assistance to law enforcement authorities for consideration in a criminal matter.   CI-43 has continued to maintain contact and provide information with to the EPD&VCTF in furtherance of assisting in drug investigations.   Since 1999, CI-43 has conducted in excess of twenty (20) successful controlled purchases of narcotics for the EPD&VCTF.  Assistance

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 22 of 68   PageID #: 41

provided by CI-43 has resulted in convictions in federal and state court cases. CI-43 provided information regarding HESS, MOSBY, and other yet to be fully identified target subjects in West Virginia associated with this DTO. The information provided by CI-43, regarding HESS, was corroborated through consensually monitored communications made with HESS in this investigation and through a controlled purchase of narcotics made from HESS. CI-43 further advised that HESS was living with MOSBY in a trailer located in Berkeley County, WV and that MOSBY was also assisting HESS in distributing narcotics. CI-43 has an adult criminal history related to DUI, larceny, and obtaining property under false pretense. Information provided to the EPD&VCTF by CI-43 was determined to be gleaned from first-hand interaction with HESS, a target subject of this investigation. Within the context of the information provided by CI-43 which was detailed and relied upon for purposes of this application, law enforcement believes the confidential source is credible and his/her information is reliable.

## FACTS ESTABLISHING PROBABLE CAUSE

20.     In this affidavit, I seek permission to continue the interception of wire and electronic communications over the TARGET TELEPHONE in order to further uncover the scope of the DTO's drug trafficking activities. In particular, the interception of the TARGET TELEPHONE will enable investigators to establish identifying information for the source of drug supply for the TARGET SUBJECTS, the location of "stash houses" being utilized by the TARGET SUBJECTS, the methods being utilized by the TARGET SUBJECTS to conceal drug proceeds, and to disrupt and dismantle this violent, drug trafficking organization.

21.     During the course of the investigation, the EPD&VCTF has identified TARGET SUBJECTS RICHARDSON, BRAHEEM, THEODORE, ALVIN, JENKINS,

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 23 of 68   PageID #: 42

HESS, YOUNG, HALLACK and VINCENT to be conspiring with each other as well as with other TARGET SUBJECTS to engage in drug trafficking and violent acts in and around the Eastern Panhandle of West Virginia.

22. On August 27, 2019, your affiant submitted an affidavit in the Northern District of West Virginia seeking authority to intercept wire and electronic communications occurring over **TT2**. Authority was granted (3:19-MC-33) by Chief United States District Judge Gina M. Groh and interceptions began on August 27, 2019. Your affiant requests the referenced affidavit be incorporated into this instant affidavit. Interceptions being conducted under the authority granted on 08/27/2019 are currently authorized to continue until September 26, 2019. Your affiant seeks to obtain authority to continue interception of **TT2** for an additional thirty-day period by way of this instant affidavit.

23. On August 28, 2019, RICHARDSON received a text message on **TT2** from a subject (later identified as YOUNG) who was utilizing telephone number 202-389-8138 (CP16) requesting that RICHARDSON contact him on the captioned telephone number. RICHARDSON then placed an outgoing telephone call from TT2 to YOUNG (CP16). During the conversation, RICHARDSON asked YOUNG, "Yo, you ready?" YOUNG advised that he is ready and the two individuals agreed to meet at "the store" which is known to investigators as "The Fashion Factory" located in Ranson, WV. EPD&VCTF investigators monitoring fixed video surveillance cameras in the vicinity of RICHARDSON's store observed RICHARDSON park near the store in a dark gray Cadillac. After a few minutes, officers observed a gold colored Chevy Tahoe SUV bearing a Maryland registration, pull beside RICHARDSON's vehicle, turn around, and ultimately take a position behind RICHARDSON's Cadillac. The two vehicles were then observed to drive away from the store to an area that was not able to be monitored by the EPD&VCTF fixed surveillance camera. Approximately

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 24 of 68   PageID #: 43

three hours later, RICHARDSON sent an outgoing SMS message from TT2 to YOUNG. The captioned message which was intercepted by EPD&VCTF officers monitoring RICHARDSON's communications over TT2 observed the message to be a photograph sent by RICHARDSON of what appeared to be a container of liquid Phencyclidine (PCP). RICHARDSON advised to YOUNG via text message over TT2, "This a gallon so it prolly like 16 os short of a gallon." Investigators believe RICHARDSON is referring to the amount of PCP that RICHARDSON is depicting in his photograph. Later on the same evening, RICHARDSON receives an incoming call on TT2 from YOUNG. YOUNG, "Yeah, I got the, I got the other three on hold for you baby, ain't no rush, cuz, slow motion." Investigators believe that YOUNG had supplied RICHARDSON with the PCP earlier during the meeting that was partially observed via fixed video surveillance located near his store in Ranson, WV. Additionally, investigators believe that YOUNG is advising that his source of PCP supply has an additional three (3) containers of PCP, similar to the container that RICHARDSON sent a photograph of via SMS message to YOUNG earlier in the evening.

24. On September 1, 2019, investigators utilized CI-FORTY to engage in a consensually monitored text message conversation with RICHARDSON. Communications between CI-FORTY and RICHARDSON were intercepted by the EPD&VCTF over TT2. During the conversation, RICHARDSON confirmed that he was able to sell 15 grams of heroin at a price of $70 per gram, for a total cost of $1,050. The controlled purchase was conducted at RICHARDSON's residence located in Harpers Ferry, WV. Prior to, and subsequent to, the controlled purchase, EPD&VCTF surveillance officers monitored fixed video surveillance cameras located in the area of RICHARDSON's residence.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 25 of 68   PageID #: 44

Additionally, surveillance officers attempted to conduct physical surveillance of RICHARDSON's residence.  However, due to the location of the residence, officers were not able to sit in a fixed surveillance location to monitor individuals meeting with RICHARDSON prior to the controlled drug purchase. As such, investigators were not able to identify any vehicles or subjects that would have met with RICHARDSON prior to the controlled drug buy with CI-FORTY.  During the controlled heroin purchase, RICHARDSON advised to CI-FORTY that he was in possession of "wet" (known to investigators as liquid PCP) and showed a container of the PCP to CI-FORTY.  RICHARSON advised that he could sell the PCP to CI-FORTY at a price of $250 per liquid ounce.

25. On September 4, 2019, RICHARDSON engaged in a conversation over TT2 with YOUNG regarding the liquid PCP.  The conversation initiated via text messages sent from YOUNG to TT2 advising that he is on his way to West Virginia and wanted to know if he can get together with RICHARDSON. Investigators were aware that YOUNG is asking RICHARDSON if he has completed selling the liquid PCP and has money available for YOUNG. RICHARDSON responded that he still has the PCP from before.  The two engaged in a voice call in which RICHARDSON advised, "I still got the whole thing" (referring to the entire container of PCP).  YOUNG asked RICHARDSON if he "has someone that might want it?"  RICHARDSON then advised that he has spoken to his Uncle and that he will be heading to a family reunion "next week" in New Jersey to see his Uncle.  RICHARDSON advised that his Uncle

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 26 of 68   PageID #: 45

would "grab it" if "it's right." YOUNG then asked RICHARDSON "how many things is inside one?"  YOUNG was asking RICHARDSON how many ounces of liquid PCP are in the approximate gallon that he received earlier, on August 28, 2019, from YOUNG.  RICHARDSON clarified asking YOUNG, "in one G?" (referring to on gallon).  RICHARDSON advised "that shit was short, I had put that shit in that gallon jug, it was short." (referring to the amount being slightly less than one gallon).  RICHARDSON then asked YOUNG "remember the picture I sent you?" (referring to the photograph that he sent via SMS message on August 28, 2019).  YOUNG then requested that RICHARDSON send the photograph a second time.  RICHARDSON then proceeded to send the photograph again of the "gallon jug" of liquid PCP to YOUNG.  YOUNG called RICHARDSON back and asked if he was able to determine how many ounces were in the container.  RICHARDSON responded that he did not "individual it out" because his Uncle was interested in buying the entire gallon. RICHARDSON advised that his Uncle will most likely buy the liquid PCP however, in the event that the Uncle does not want to buy it, RICHARDSON woulf return the PCP to YOUNG.  YOUNG agreed to allow RICHARDSON to inquire with his Uncle an interest in purchasing the entire gallon of PCP.

26. On September 4, 2019, EPD&VCTF investigators utilized CI-43 to conduct a controlled purchase of cocaine from HESS.  During the controlled purchase, HESS and CI-43 traveled to                          Inwood to obtain the cocaine from a third party (HALLACK).  During the meeting at Midshipmans

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 27 of 68   PageID #: 46

Drive, recorded U.S. currency was exchanged for powder cocaine which was ultimately recovered by the EPD&VCTF.

27. On September 4, 2019, subsequent to the aforementioned controlled purchase from HESS and the third-party subject (HALLACK), EPD&VCTF investigators monitoring intercepted communications over **TT2**, intercepted text messages between RICHARDSON and HESS indicated that they were possibly planning a home invasion robbery.  This was evidenced in RICHARDSON's text message to HESS in which he said, "What we talked about the last easy money."  HESS responded to RICHARDSON with a text message stating, "Yes but he don't ever leave his crib tho is the issue I mean he never leaves...So we gotta rethink our approach..." Based on these communications, EPD&VCTF investigators believed that HESS and RICHARDSON were referring to the third party subject (HALLACK) from whom HESS had obtained cocaine from earlier in the day during the controlled drug transaction with CI-43.

28. On September 4, 2019, the EPD&VCTF sought and obtained a local search warrant for the residence identified as                         Inwood, WV. Probable cause for the search warrant was obtained through five controlled purchases of powder cocaine made by CI-43 from HESS which occurred on August 12, 15, 27, 29, and September 4, 2019.  During each of the controlled cocaine purchases, HESS was surveilled by the EPD&VCTF to travel from her residence to the Midshipmans Drive address to obtain cocaine to then sell to CI-

27

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 28 of 68   PageID #: 47

43 as part of the controlled drug purchase.  To identify the individual (later confirmed to be HALLACK) who was providing HESS with cocaine and to possibly intervene in HESS and RICHARDSON's plan to conduct a robbery of HALLACK, HESS's cocaine supplier, the EPD&VCTF sought and obtained a state search warrant which was issued by the Berkeley County (WV) Magistrate Court on 09/04/2019.

29. On September 5, 2019, the EPD&VCTF sought and obtained, via search warrant in the Northern District of West Virginia (3:19-MJ-104), authority to collect precision location data associated with YOUNG's cell phone, 202-389-8138 (CP16).

30. On September 5, 2019, members of the EPD&VCTF along with uniformed members of the Martinsburg Police Department and Berkeley County Sheriff's Office attempted to execute the search warrant on Inwood, WV. After knocking, clearly announcing a law enforcement presence and their purpose at the residence, and waiting a reasonable amount of time, officers made entry into the residence and were encountered by HALLACK who fired multiple shots from a semi-automatic handgun at the searching officers.  After an extended period of barricade by HALLACK, he eventually surrendered to officers and was arrested by the Berkeley County Sheriff's Office for attempted murder of police officers.

31. On September 6, 2019, EPD&VCTF investigators monitoring communications occurring over **TT2** intercepted a voice call with HESS (CP1).  During the conversation, HESS informed RICHARDSON of HALLACK's September 5, 2019

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 29 of 68   PageID #: 48

arrest. Specifically, HESS stated, "Dude we was going to get? We can't get him, he had a shootout with the cops yesterday and he's in jail." HESS is referring to HALLACK as the individual that they had previously planned on robbing. RICHARDSON responded to HESS, "that shit still in his house though?" questioning HESS if she knows if HALLACK's drugs are still in the house (10 Midshipmans Drive, Inwood, WV) where the shooting incident had occurred. HESS and RICHARDSON continued to talk about HESS's belief that HALLACK's drugs were still hidden in HALLACK's residence. Specifically, HESS advised that HALLACK was not charged with drug possession therefore the drugs could not have been found in the search warrant. RICHARDSON and HESS then discussed the possibility of going back to HALLACK's residence at night in an effort to find HALLACK's stash of cocaine. HESS responded to RICHARDSON, "I'm ready, I'm ready whenever you are. Would be better to do it at nighttime." In response, EPD&VCTF investigators executed another state search warrant on September 7, 2019 at                         Inwood, WV in an effort to locate cocaine hidden under the residence as described by HESS via conversations intercepted over **TT2** with RICHARDSON. Additionally, the execution of the additional search warrant was obtained in and effort to thwart RICHARDSON and HESS's plan to trespass/burglarize the residence, which was known by investigators to be occupied by other individuals. As far as investigators know, RICHARDSON and HESS did not burglarize the residence. EPD&VCTF investigators did not locate or seize any narcotics during the aforementioned searches of the Midshipmans Drive residence.

32. On September 6, 2019, YOUNG places a telephone call to RICHARDSON on **TT2**. YOUNG asks RICHARDSON to tell him the approximate weight of the "can" (referring to the container that the liquid PCP was first delivered in). RICHARDSON responds that he had thrown the can away after pouring it into a gallon jug because the can had a bad smell. RICHARDSON asks YOUNG if he was aware of "anybody down there that was interested in that (liquid PCP) or

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 30 of 68   PageID #: 49

that was fucking with it and shit?" YOUNG responded that he did have people interested. RICHARDSON confirms his opinion that the PCP is "fire" but that it is difficult to sell in West Virginia and that was his reason for wanting to take it to New Jersey where PCP is easier to sell. YOUNG asks RICHARDSON why it is difficult to sell in West Virginia. RICHARDSON responds "I was gonna fuck with Old Boy but he be doing that shit. I wasn't trying to put that shit in his hand. A lot of niggers out here that want it, often times, they do that shit and I ain't really trying to have them niggers juked out and shit, you know what I mean?" (RICHARDSON is advising that the people that he would use to help him sell the PCP are also users and that he would worry about them using the product and acting irrational as a result).

33. On September 9, 2019, YOUNG places a call to RICHARDSON on **TT2**. YOUNG advised that he was trying to "calculate something on my end" referring to how much money he will need to make by determining how many ounces of PCP he gave to RICHARDSON on August 28, 2019. RICHARDSON advises that "it's probably about 115 o's" referring to 115 fluid ounces of liquid PCP. RICHARDSON advised that the next time YOUNG gets a gallon in the can, to pour it out into a "pee thing" referring to a container that measures the amount of liquid.

34. On September 9, 2019, the EPD&VCTF sought and obtained search warrants (3:19-MJ-109 and 3:19-MJ110) in the Northern District of West Virginia, to place GPS tracking devices on two vehicles observed to be operated by RICHARDSON while engaging in drug distribution activities. A GPS tracker was successfully installed by the EPD&VCTF on a Toyota 4-Runner, operated by RICHARDSON, on September 10, 2019 in Martinsburg, WV. Investigators have been able to use the installed GPS tracker to monitor general direction of travel engaged in by RICHARDSON while operating the Toyota 4-Runner.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 31 of 68   PageID #: 50

Additionally, the EPD&VCTF has learned of a location in Martinsburg, WV where RICHARDSON is attending a barbering school. The identification of the barber school location was obtained via physical surveillance conducted through coordinated use of the data obtained from the GPS tracking device installed by the EPD&VCTF. The tracking device has not allowed investigators to confirm RICHARDSON's purpose for travel, who he meets with to obtain narcotics for further re-distribution, or the location of his stash house(s). Furthermore, the GPS tracking device provides investigators with an approximate location of RICHARDSON's vehicle yet not an exact location. The tracking device does not allow investigators to determine RICHARDSON's location during times when he exits his vehicle to travel on foot or in another vehicle other than the monitored Toyota 4-Runner.

35.   On September 10, 2019, HESS, utilizing CP1, engages in a series of text messages with RICHARDSON that are intercepted over **TT2**. HESS advised, "I'm almost out of both but down is what I got less of and if u give me a time u coming I could end up having it all by the time u get hereI'm almost out of both but down is what I got less of and if u give me a time u coming I could end up having it all by the time u get hereLet me count this again." HESS was referring to heroin and advised that she has almost sold all of the heroin that she recently obtained from RICHARDSON. After RICHARDSON requested that HESS notify him of the amount of money she has and how much resupply of drugs she will need. HESS advised, "Ok Ineed a g n half of the up for a sale because I don't have the whole ball here can u do that and ok let me Kno when u pull nOk Ineed a g n half of the up for a sale because I don't have the whole ball here can u do that and ok let me Kno when u pull nI just texted u and told u." HESS asked RICHARDSON for 1 and ½ grams of crack cocaine in addition to heroin for a pending sale that she has agreed to with an unknown customer. RICHARDSON advised, "Anit no reason u shouldn't have all the bread."

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 32 of 68   PageID #: 51

(referring to his belief that HESS needs to have all of his money when he sees her). HESS responded, "Yo I've got 1840 I've got something different each time I counted bills was stickin." (HESS is advising that she has $1,840 to give to RICHARDSON for previously fronted narcotics). RICHARDSON agreed to meet HESS at her residence. EPD&VCTF surveillance officers observed RICHARDSON's vehicle arrive at HESS's residence at a time consistent with intercepted text messages from RICHARDSON (**TT2**) to HESS (**CP1**) indicating that he was on his way to see HESS. RICHARDSON's vehicle was observed to leave HESS's residence a short time later. Physical surveillance attempted to follow RICHARDSON's vehicle from HESS's residence but terminated the surveillance after determining that RICHARDSON appeared to be driving on back roads towards Martinsburg, WV and attempts to follow his vehicle would jeopardize the investigation by revealing to RICHARDSON the presence of surveilling law enforcement officers.

36. On September 12, 2019, EPD&VCTF officers monitoring voice and electronic communications occurring over **TT2** intercepted a text message conversation between RICHARDSON (**TT2**) and YOUNG (**CP16**). The conversation began with YOUNG asking "How do things look on ur end" to RICHARDSON. YOUNG is asking RICHARDSON if he still planning on taking the approximate 1 gallon of liquid PCP to New Jersey. RICHARDSON responded that he did not go to New Jersey and advised that if YOUNG is in town, he can come to West Virginia to pick up the PCP. YOUNG stated "Ok, cause I got un necessary pressure" referring to his source of PCP holding YOUNG accountable for the cost of the fronted PCP. RICHARDSON responded "It's just something that now really wanted", "It's not like what we deal with", "Not really wanted I mean", "It's a early 2000s 90s thing." RICHARDSON is referring to the fact that not many people in West Virginia are looking to buy PCP and that the drug was popular in the early 2000s or late 90's. YOUNG responded "Yeah, but still in lil demand."

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 33 of 68   PageID #: 52

37.  On September 13, 2019, YOUNG (CP16) and RICHARDSON (**TT2**) engaged in a text message conversation, in continuance of the captioned 9/12/2019 conversation.  YOUNG told RICHARDSON "Omw" referring to YOUNG on his way traveling to West Virginia from Baltimore, MD.  RICHARDSON advised that he is not available to meet until after 5:00pm because he is in school.  Later in the day, YOUNG sent a text message to RICHARDSON (**TT2**) advising "Here wait on u at 5" which indicated that YOUNG is in West Virginia and will wait to meet with RICHARDSON to get the PCP around 5:00pm.  RICHARDSON responded, "Hey my girl left tht on the porch in the cooler for u Incase I'm not back by 5 it's in a gallon milk jug."  RICHARDSON advised that his girlfriend left the PCP in a gallon milk jug inside of a cooler on RICHARDSON's porch.  EPD&VCTF surveillance officers utilized the captioned interceptions along with precision location data obtained for YOUNG's telephone (CP16) to observe YOUNG travel to RICHARDSON's residence located on Hostler Road, Harpers Ferry, WV.  YOUNG removed the milk jug referenced by RICHARDSON from the cooler located on the porch of the residence and drove away from the residence.  Shortly after leaving the residence, EPD&VCTF officers facilitated a traffic stop to be conducted by the West Virginia State Police (WVSP) based on the fact that YOUNG was operating a vehicle with expired tags.  WVSP officers utilized a law enforcement, drug detection K-9 around the vehicle being operated by YOUNG.  The K-9 unit alerted to the presence of narcotics and the vehicle was then searched by WVSP.  Officers recovered the aforementioned milk jug containing PCP (positive field test), vials, and stamps for "soaking" the PCP.  YOUNG was arrested by the WVSP for possession with intent to distribute narcotics.  EPD&VCTF investigators did not attempt to interview YOUNG subsequent to his arrest in an effort to avoid alerting YOUNG and RICHARDSON to law enforcement's awareness of the PCP being taken from RICHARDSON's residence.  Alerting YOUNG to the knowledge gleaned by law

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 34 of 68   PageID #: 53

enforcement regarding the PCP would jeopardize RICHARDSON's use of **TT2** and thwart the EPD&VCTF's ability to utilize interceptions of **TT2** to accomplish the investigative goals of identifying RICHARDSON's source of heroin and crack cocaine supply. Furthermore, when WVSP officers removed the liquid PCP from YOUNG's vehicle, YOUNG advised that he did not know what the substance was. Based on intercepted communications between RICHARDSON (**TT2**) and YOUNG (CP16), it is evident to investigators that YOUNG was aware of the identification of the substance contained in the "milk jug" and was demonstrating his untruthfulness to law enforcement.

38.   On September 14, 2019, EPD&VCTF officers monitoring voice and electronic communications occurring over **TT2** intercepted a series of voice calls and text message communications occurring between RICHARDSON (**TT2**) and HESS (CP1). During the conversation, HESS sent the following text message to RICHARDSON, "Ima need to see u na lik I'm completely out of down but still got a good bit of up can u bring me some down I got 1700 for u but the dude was suppose to come grab this up I got but it wont b till like 8 tonight. He is grabbing almost the o of up you gave me." HESS is advising that she has sold all of the heroin that RICHARDSON gave her and that she still has approximately one ounce of cocaine which she is supposed to be selling to another individual later in the evening. Additionally, HESS is advising that she has $1,700 ready to give to RICHARDSON. RICHARDSON responded, "Ite so you got 17 an u need down?" confirming his understanding that HESS has $1,700 and that she needs a resupply of heroin. HESS does not respond to RICHARDSON's text message which prompted RICHARDSON to place a voice call from **TT2** to HESS. During the call, RICHARDSON asked HESS, "so you got 17 and you need down right?" HESS confirmed RICHARDSON was correct and he advised that he will be at HESS's in a "little bit." EPD&VCTF investigators monitored the precision location data associated with **TT2** to confirm that he in fact traveled to HESS's residence.   After it was apparent to EPD&VCTF investigators that

34

RICHARDSON and HESS's meeting had ended, RICHARDSON placed a call from TT2 to HESS (CP1) to advise that the money that HESS had given to him during their meeting was not the correct amount. HESS was supposed to give RICHARDSON $1,700 for heroin that was fronted on a previous occasion. RICHARDSON is believed to have counted the money provided by HESS and determined the amount to be short. HESS responded that she though she counted the money accurately and that she had given RICHARDSON $1,700. RICHARDSON stated, "There's 1580" *($1,580)*. RICHARDSON then proceeded to lecture HESS about having the correct amount of money. He states, "I'm not gonna give you 20 grams – I'm not gonna give you 10 grams and tell you it's 20." RICHARDSON is comparing HESS's mistake in providing the incorrect amount of money to RICHARDSON providing the wrong amount of heroin. HESS advised that she understands. After the voice call ends, RICHARDSON sent HESS a text message stating "It's Deff 1580."

39. On September 15, 2019, RICHARDSON and HESS engaged in a conversation via text message and voice calls occurring over **TT2**. HESS advised via text message, "Yo I need to talk to u tho when I get away from family I'll call u it's not bout money or anything just so y kno." RICHARDSON responded, "Wasup wit tht money tho?" RICHARDSON is referring to the remaining amount of money that HESS did not provide to him on 09/14/2019 as noted in the previous paragraph. HESS responded to RICHARDSON, "I got u soon as I leave my grandparents."

40. Based on my training, experience, and knowledge of this investigation and review of intercepted communications occurring over **TT2**, I believe that RICHARDSON is using HESS and other subjects to further distribute heroin and crack cocaine as evidenced in the aforementioned conversation with HESS in which he requests information from HESS regarding the amount of money she has collected to date, and expresses a need to know the amount of remaining

35

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 36 of 68   PageID #: 55

narcotics she has left to sell to cover her drug debt to RICHARDSON. Furthermore, I believe that YOUNG is supplying RICHARDSON with liquid PCP in an effort to determine if there is a market for the product in West Virginia. RICHARDSON is attempting to determine if he is able to sell the PCP that is in his possession as evidenced in his offer to CI-FORTY to sell the PCP for $250 per ounce.

### NEED FOR INTERCEPTION

41.  The objective of this investigation is to obtain evidence to fully prosecute SHAQUAN RICHARDSON, the TARGET SUBJECTS, and others as yet unknown involved in the drug trafficking enterprise.

42.  I believe that the continued interception of wire and electronic communications over **TT2** will enable the government to further the goals and objectives of this investigation.  Specifically, these include:

   a.   discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of RICHARDSON and the DTO;

   b.   discovering the identities and roles of all suppliers of cocaine, crack cocaine, heroin, and/or other drugs or controlled substances to RICHARDSON and the identified conspirators;

   c.   discovering the identity of the main customers of RICHARSON and the others yet unknown;

   d.   discovering the stash locations where cocaine, crack cocaine, PCP, heroin, and/or other drugs are stored prior to distribution;

   e.   discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and

   f.   obtaining admissible evidence that demonstrates beyond a reasonable doubt that RICHARDSON, and the other TARGET

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 37 of 68   PageID #: 56

SUBJECTS and any later identified targets, committed the alleged violations of law set forth herein.

58. Continued interception of wire and electronic communications over **TT2** is necessary in this matter because normal investigative techniques have been tried and have failed to fully achieve the goals and objectives of this investigation, appear reasonably unlikely to succeed if tried, or are too dangerous to be tried.

59. The following is a list of the investigative techniques that have been used or considered thus far in this investigation. Details about the use of each technique with regard to RICHARDSON and the other TARGET SUBJECTS, the success or failure of the technique, and what the technique has accomplished or failed to accomplish with regard to the goals and objectives of this investigation are discussed. If an investigative technique was not employed, I have provided an explanation as to why the technique was not used.

### Confidential Sources

60. It is my experience that confidential sources normally have limited information, either furnished by a subject or learned secondhand from others. I believe that this information would not, without the evidence sought by this application, result in a successful prosecution of all members of this illegal DTO.

61. In the present case, investigators have been able to develop and utilize confidential informants to make controlled drug purchases from RICHARDSON, BRAHEEM, THEODORE, ALVIN, HESS, HALLACK and VINCENT. Although a confidential informant is able to discuss immediate drug transactions between them self and a TARGET SUBJECT, the informants used in this investigation (CI-19, CI-FORTY, CI-BLUE, and CI-43) have not been able to discuss sources of

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 38 of 68   PageID #: 57

drug supply for the DTO or drug transactions that involved other non-present customers. The confidential informants listed have been able to provide investigators with drug amounts and drug prices that are relevant to the controlled purchases made on behalf of the EPD&VCTF. However, they have not been able to provide investigators with drug amounts and prices relevant to the DTO's source of drug supply. Furthermore, the confidential informants have not been able to provide any investigative intelligence that would assist officers in furthering this investigation beyond RICHARDSON's hierarchy level within the DTO. CI-19 is no longer in a position to assist the EPD&VCTF in furthering this investigation because ALVIN and VINCENT have been arrested thus CI-19 is not in a position to make any additional controlled activity that would assist in completing the goals of this investigation. CI-FORTY and CI-BLUE are currently in a position to continue to make controlled drug buys from members of this DTO to include RICHARDSON. However, continuing to make controlled drug purchases from the same target subjects increases risks to the safety of the confidential informants and to revealing the presence of this investigation to the target subjects. EPD&VCTF investigators are seeking to obtain identities of the source of drug supply to RICHARDSON's DTO, stash house locations utilized by the DTO, any and all methods used by the DTO to conceal drug proceeds, and methods used to traffic the narcotics into the Eastern Panhandle region of West Virginia. The confidential informants have been unable to provide this information. The confidential informants used in this investigation have been advised of the potential for a need to testify in this case. Due to previous incidents of violence related to this DTO, specifically shooting incidents to include the drug related homicide alleged to have been committed by ALVIN, confidential informants may be reluctant to testify. As such, the need to intercept communications occurring over **TT2** exists to allow the EPD&VCTF to continue this investigation should the confidential informants later refuse to testify.

## Controlled Purchases

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 39 of 68   PageID #: 58

62. During the course of this investigation, I, along with other agents and other law enforcement officers, participated in over 15 controlled purchases of narcotics, using **confidential informants**, from ALVIN, VINCENT, RICHARDSON, BRAHEEM, THEODORE, HESS and other members and associates of the DTO. These controlled purchases have not been effective in meeting the goals of this investigation.  Surveillance conducted by the EPD&VCTF during the controlled purchases have not revealed where the TARGET SUBJECTS are storing drugs, weapons, and drug proceeds.  Although confidential informants have been able to enter residences belonging to TARGET SUBJECTS during controlled drug buys, the target subjects do not reveal drug, weapon, and drug proceeds or stash locations to the confidential informants.  Additionally, controlled purchases have allowed investigators to monitor conversations between the confidential informants and the identified TARGET SUBJECTS.  These conversations do not reveal the TARGET SUBJECT's sources of drug supply, hierarchy of DTO leadership, or identities of other co-conspirators.  The controlled conversations, monitored by law enforcement officers during controlled purchases, reveal that the target subjects limit their conversations with the confidential informants to minimal content only necessary to complete the drug transaction at hand.  The method of arresting subjects after completing controlled purchases has been utilized and has failed as evidenced in the arrest of VINCENT and ALVIN in which attempts to interview them did not reveal any information regarding the DTO's stash houses, methods for concealing drug proceeds, hierarchy structure within the DTO, or ultimate source of drug supply to the DTO.  Surveillance conducted by EPD&VCTF members subsequent to controlled drug purchases have failed to reveal the identified subjects traveling to stash house locations or meeting with potential sources of supply.

**Physical Surveillance**

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 40 of 68   PageID #: 59

63. Surveillance, in and of itself, even if highly successful, rarely succeeds in gathering evidence of the criminal activities under investigation. It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.

64. When physical surveillance is used in conjunction with court-authorized interception of wire and electronic communications, the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity.

65. The subjects of this investigation are extremely cautious and aware of law enforcement surveillance. Attempts to conduct physical surveillance to accomplish the goals of this investigation include but are not limited to the following:

    A.   On March 4, 2019, the EPD&VCTF conducted physical surveillance of RICHARDSON's residence located at 1220 Hostler Road, Harpers Ferry, WV. Investigators observed the residence to be in a heavily wooded area accessed from a road with little traffic and offering no safe vantage point to conduct stationary surveillance from. Investigators attempted to conduct a drive-by surveillance of the residence to allow for observation of the front of the property and identify any vehicles present at the residence. While attempting to drive by the front of the residence at a speed which would allow for investigators to observe license plates attached to vehicles parked in front of the residence, RICHARDSON appeared outside of the residence to monitor the activity of the surveilling officer. The officer attempted to park in a driveway located across the street from RICHARDSON's residence. RICHARDSON and a female associate

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 41 of 68   PageID #: 60

then got into a vehicle and drove towards the officer.  RICHARDSON
and the female associate turned into the driveway that was occupied
by the EPD&VCTF surveillance officer.   RICHARDSON and his
female associate then proceeded to ask questions to the surveilling
officer as to their presence in the area.  This incident demonstrates
the difficulty that exists in attempts to surveil RICHARDSON's
residence.  Due to the geographic location of the residence, the only
vantage point from which one could see the front of the residence
would be to remain stationary on the road directly in front of the
residence where his driveway meets Hostler Road.  An attempt to gain
a vantage point from that location was met with immediate counter
surveillance   efforts   by   RICHARDSON   in   approaching   the
EPD&VCTF surveillance vehicle.

B.    During the months of March and April, 2019, EPD&VCTF conducted
physical surveillance of RICHARDSON's clothing store known as the
"Fashion Factory" in Ranson, WV.  During this captioned time period,
RICHARDSON's vehicle was observed multiple times to be parked in
a lot behind the store.  However, officers were not able to observed
RICHARDSON meeting with other individuals inside of the store or
determine what activities RICHARDSON was engaging in while in
the store.

C.    On May 13, 2019, EPD&VCTF officers attempted to conduct physical
surveillance at RICHARDSON's Harpers Ferry residence after
completing a controlled drug purchase using CI-FORTY.  Surveillance
officers were able to determine that a red colored Nissan Altima
bearing a West Virginia registration had left the vicinity of
RICHARDSON's residence.  Because surveillance officers were not
able to sit in a fixed location with a vantage point allowing for

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 42 of 68   PageID #: 61

observation of RICHARDSON's residence.  The surveillance units were not able to observe the vehicle until it had turned onto a main road that intersects Hostler Road.  At this time, a surveillance officer attempted to follow the vehicle as it traveled towards Charles Town, WV.  Because the vehicle was being followed by surveillance officers from a remote area near Hostler Road for a distance to Charles Town, WV, surveillance was terminated on the vehicle to avoid suspicion and the chance of jeopardizing the investigation.  The vehicle's registration returned to a Post Office Box located in Summit Point, WV.  Investigators were not able to identify the vehicle's location subsequent to terminating the surveillance.

D.   On May 22, 2019, EPD&VCTF officers conducted physical surveillance subsequent to a controlled drug purchase from RICHARDSON.  Surveillance officers obtained a vantage point on a bridge located on a road that crossed over Hostler Road, Harpers Ferry, WV by staging a disabled vehicle incident on the shoulder of the bypass bridge.  Due to the volume of traffic on the bridge and danger associated with remaining stationary on the bridge, officers were only able to maintain this surveillance vantage point for a limited period of time.  Officers were able to observe a silver colored Dodge minivan parked in the driveway of RICHARDSON's residence.  Two occupants were observed leaving RICHARDSON's residence and entering the captioned minivan.  The vehicle was then followed by EPD&VCTF surveillance officers as it left RICHARDSON's residence and traveled from Harpers Ferry, WV to Ranson, WV.  At approximately 2045 EST, the vehicle was stopped by a Jefferson County Sheriff's Office Deputy for a traffic infraction.  BRAHEEM was an occupant of the vehicle.  Uniformed officers conducting the traffic stop were granted consent to look into the vehicle.  However,

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 43 of 68   PageID #: 62

officers were not able to conduct a full search of the vehicle for narcotics or other contraband in a manner that would not potentially jeopardize the ongoing drug investigation.   BRAHEEM informed officers conducting the traffic stop that he was on his way back to Martinsburg from shopping.   Officers did not attempt to interview BRAHEEM during this traffic stop for fear of divulging the fact that he had been observed leaving RICHARDSON's residence in Harpers Ferry, WV.

E.   RICHARDSON has frequented the Charles Town Casino located in Charles Town, WV, several times during the course of this investigation.   During the visits to the casino, EPD&VCTF officers have made multiple attempts to conduct physical surveillance of RICHARDSON in coordination with the use of the casino's video surveillance systems.   However, investigators have not obtained evidence through this surveillance that would accomplish the goals of this investigation.   RICHARDSON has been extremely conscientious of surveillance making physical surveillance inside of the casino difficult.   As such, investigators have attempted to use the casino's video surveillance system to follow RICHARDSON inside of the casino during his visits.   Although the casino has several cameras that monitor the activity around the gaming areas of the casino floor, the cameras do not have a full view of the entire casino and RICHARDSON often times moves through locations where video coverage is not available such as in restrooms.   Additionally, the casino's video surveillance system does not capture audio thus investigators are not able to monitor RICHARDSON's conversations that he has with other patrons in the casino.   Examples of efforts to surveil RICHARDSON's casino visits are noted as follows:

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 44 of 68   PageID #: 63

    i.       On August 2, 2019, EPD&VCTF officers conducted surveillance of RICHARDSON as he was observed entering the Charles Town Casino in Charles Town, WV. Utilizing the casino's video surveillance system, RICHARDSON can be observed engaging in gambling activity within the gaming area of the casino. RICHARDSON is also observed engaging in conversations with several unidentified individuals however, the content of these conversations is not known to investigators. Investigators were not able to confirm the purpose of RICHARDSON's travel to the casino on this date.

    ii.      On August 3, 2019, EPD&VCTF officers conducted surveillance of RICHARDSON as he was observed returning to the Charles Town Casino in Charles Town, WV. Utilizing the casino's video surveillance system, RICHARDSON can be observed in the gaming area of the casino. RICHARDSON is also observed engaging in conversations with several unidentified individuals however, the content of these conversations is not known to investigators. Investigators were not able to confirm the purpose of RICHARDSON's travel to the casino on this date.

F.    On August 3, 2019, EPD&VCTF surveillance officers conducted a physical surveillance of RICHARDSON's store "Fashion Factory" and observed the store to appear to be closed and vacant. On the same date, surveillance officers conducted a drive by surveillance of RICHARDSON's residence,             Harpers Ferry, WV, in an effort to observe vehicles and or subjects present at the

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 45 of 68   PageID #: 64

residence. A blue Cadillac 4 door sedan bearing West Virginia registration 64E310 was observed to be parked adjacent to the residence at the top of the driveway area. Surveillance officers were not able to establish a fixed location to sit and conduct additional surveillance due to the geographic location of the residence and without drawing the attention of any occupants located in RICHARDSON's residence.

G.   On September 4, 2019, EPD&VCTF investigators attempted to coordinate the monitoring of communications occurring over **TT2** with physical surveillance of RICHARDSON who had engaged in conversation indicating that he was planning to travel from Harpers Ferry, WV to Martinsburg, WV. Surveillance officers observed two vehicles exit RICHARDSON's residence in Harpers Ferry, WV. The two vehicles traveled in tandem towards Charles Town, WV where one of the vehicles, a blue Jeep Cherokee style vehicle continued to travel around the Charles Town area while the second vehicle, a Toyota 4-Runner confirmed to be operated by RICHARDSON, continued traveling on obscure, back roads between Charles Town and Martinsburg in an effort to prevent law enforcement surveillance efforts. This effort to thwart surveillance officers was apparent in a text message from RICHARDSON (**TT2**) sent to the unidentified individual with whom he intended to meet in Martinsburg in which he stated "Cmn off back road had to take detour police." EPD&VCTF investigators are aware that RICHARDSON is referring to traveling on the obscure back roads to avoid police surveillance and detection.

H.   On September 13, 2019, YOUNG (CP16) and RICHARDSON (**TT2**) engaged in a text message conversation, in continuance of the

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 46 of 68   PageID #: 65

captioned 9/12/2019 conversation.   YOUNG told RICHARDSON "Omw" referring to YOUNG traveling on his way to West Virginia from Baltimore, MD.  RICHARDSON advised that he is not available to meet until after 5:00 p.m. because he is in school.  Later in the day, YOUNG sent a text message to RICHARDSON (**TT2**) advising "Here wait on u at 5" which indicates that YOUNG is in West Virginia and will wait to meet with RICHARDSON to get the PCP around 5:00pm.  RICHARDSON responded, "Hey my girl left tht on the porch in the cooler for u Incase I'm not back by 5 it's in a gallon milk jug." RICHARDSON is advising that his girlfriend left the PCP in a gallon milk jug inside of a cooler on RICHARDSON's porch.  EPD&VCTF surveillance officers utilized the captioned interceptions along with precision location data obtained for YOUNG's telephone (**CP16**) to observe YOUNG travel to RICHARDSON's residence located on Hostler Road, Harpers Ferry, WV.  YOUNG removed the milk jug referenced by RICHARDSON from the cooler located on the porch of the residence and drove away from the residence.  Shortly after leaving the residence, EPD&VCTF officers facilitated a traffic stop to be conducted by the West Virginia State Police (WVSP) based on the fact that YOUNG was operating a vehicle with expired tags. WVSP officers utilized a law enforcement, drug detection K-9 around the vehicle being operated by YOUNG.  The K-9 unit alerted to the presence of narcotics and the vehicle was then searched by WVSP. Officers recovered the aforementioned milk jug containing PCP (positive field test), vials, and stamps for "soaking" the PCP. YOUNG was arrested by the WVSP for possession with intent to distribute narcotics.  EPD&VCTF investigators did not attempt to interview YOUNG subsequent to his arrest in an effort to avoid alerting YOUNG and RICHARDSON to law enforcement's awareness of the PCP being taken from RICHARDSON's residence.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 47 of 68   PageID #: 66

Alerting YOUNG to the knowledge gleaned by law enforcement regarding the PCP would jeopardize RICHARDSON's use of **TT2** and thwart the EPD&VCTF's ability to utilize interceptions of **TT2** to accomplish the investigative goals of identifying RICHARDSON's source of heroin and crack cocaine supply.  Furthermore, when WVSP officers removed the liquid PCP from YOUNG's vehicle, YOUNG advised that he did not know what the substance was. Based on intercepted communications between RICHARDSON (**TT2**) and YOUNG (CP16), it is evident to investigators that YOUNG was aware of the identification of the substance contained in the "milk jug" and was demonstrating his untruthfulness to law enforcement.

66. EPD&VCTF investigators have learned, based on the geographic location of RICHARDSON's residence and counter-surveillance efforts by RICHARDSON as noted in previous surveillance efforts, that continued surveillance will alert RICHARDSON to law enforcement interest in his activity and the activity of his DTO.  Furthermore, based on the knowledge and experience of your affiant, it is understood that drug trafficking organizations often conduct their illegal activities in which extended physical surveillance by law enforcement officers has a higher risk of exposing the presence of the investigation to target subjects.  It also poses a risk to officer safety because this DTO has demonstrated a propensity for violence and is known to be in possession of firearms.

67. Investigators in the case intend to continue conducting physical surveillance in order to positively identify additional associates of the DTO, as well as sources of supply.  I believe that continued surveillance done in conjunction with electronic surveillance will achieve these objectives and lead to the seizure of drugs and assets.  When surveillance can be planned and conducted with prior knowledge of the TARGET SUBJECTS' whereabouts and intentions, tactics can be employed

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 48 of 68   PageID #: 67

to minimize the TARGET SUBJECTS' awareness of surveillance and therefore be more productive.

## Undercover Agents

68. Due to the violence associated with this DTO, any efforts to attempt to utilize an undercover agent pose a significant risk to the safety of the officer. Additionally, the EPD&VCTF has conducted multiple controlled purchases of narcotics from members of this DTO utilizing confidential informants who have established historical relationships with target subjects in this investigation. As the confidential informants developed by the EPD&VCTF have been effective in purchasing narcotics from members of the DTO, they have not been able to discuss information with the target subjects which would accomplish the goals of this investigation. Specifically, the target subjects have not shown a willingness to discuss stash house locations, methods being utilized to conceal drug proceeds, methods of trafficking the narcotics into West Virginia, or the hierarchy of the DTO as it relates to West Virginia and other states where members of this DTO may reside. I do not believe that the use of undercover law enforcement agents, can achieve the goals of this investigation.

## Search Warrants

69. Search warrants have been attempted in this investigation and have failed to fulfill the goals of this investigation. Specifically, the EPD&VCTF executed a search warrant on February 7, 2019, on the residence and vehicle being utilized by ALVIN and VINCENT. A search of the vehicle incident to ALVIN's arrest yielded three (3) bags of suspected crack cocaine and one (1) bag of suspected

heroin. EPD&VCTF officers sought and obtained a search warrant for the residence being used by ALVIN and VINCENT which yielded clothing items consistent with clothing observed during the January 31, 2019 controlled drug purchases, a handgun magazine containing eight rounds of .40 caliber ammunition, digital scales, marijuana, and thirty-three shotgun rounds. VINCENT was interviewed during the execution of the search warrant and advised the narcotics which were in the possession of ALVIN in the vehicle during his arrest, were supplied to him by "Wave" (RICHARDSON). VINCENT also provided deceptive information to investigators regarding ALVIN's role in the aforementioned drug-related homicide as well as to her role in the DTO. ALVIN was taken to the Martinsburg Police station for further questioning where he provided investigators with a verbal confession to the murder which had occurred on February 3, 2019. ALVIN did not discuss the hierarchy of his DTO, did not provide investigators with any intelligence related to the methods used to conceal drug proceeds, locations of stash houses, or methods used to traffic narcotics into West Virginia. ALVIN advised that he was confessing to the murder only in an effort to protect VINCENT who was pregnant with their child. This search warrant was minimally effective in establishing that this DTO was responsible for acts of violence and was responsible for selling both crack cocaine and heroin. This search warrant did not accomplish the goals of the investigation that have been stated multiple times throughout this affidavit. While I believe that search warrants may produce some evidence of criminal and/or narcotics-related activity, search warrants would not be effective at achieving the larger goals of this investigation. During the course of the investigation, I have learned that members and associates of the DTO do not keep large quantities of narcotics and/or other contraband in locations where they stay. RICHARDSON has been observed by the EPD&VCTF on multiple occasions to travel from his clothing store "Fashion Factory" to meet with individuals at the Charles Town Casino in areas where investigators are not able to conduct physical surveillance. Although casino security cameras monitor much of the casino floor, the cameras do not

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 50 of 68   PageID #: 69

allow investigators to monitor conversations that RICHARDSON has with individuals inside of the casino nor do the cameras cover all areas of the casino where RICHARDSON frequents to include the restroom of the casino. A search warrant on the Charles Town Casino would not be practical nor would it allow investigators to accomplish all goals of this investigation.

70. On September 4, 2019, the EPD&VCTF sought and obtained a local search warrant for the residence identified as                      Inwood, WV. Probable cause for the search warrant was obtained through five controlled purchases of powder cocaine made by CI-43 from HESS which occurred on August 12, 15, 27, 29, and September 4, 2019. During each of the controlled cocaine purchases, HESS was surveilled by the EPD&VCTF to travel from her residence to the Midshipmans Drive address to obtain cocaine to then sell to CI-43 as part of the controlled drug purchase. To identify HESS's cocaine supplier and to possibly intervene in HESS and RICHARDSON's plan to conduct a robbery of HESS's cocaine supplier (later confirmed to be HALLACK), the EPD&VCTF sought and obtained a state search warrant which was issued by the Berkeley County (WV) Magistrate Court on September 4, 2019. On September 5, 2019, members of the EPD&VCTF along with uniformed members of the Martinsburg Police Department and Berkeley County Sheriff's Office attempted to execute the search warrant on                      Inwood, WV. After knocking, clearly announcing a law enforcement presence and purpose at the residence, and waiting a reasonable amount of time, officers made entry into the residence and encountered HALLACK, who fired multiple shots from a semi-automatic handgun at the searching officers. After an extended period of barricade by HALLACK, he eventually surrendered to officers and was arrested by the Berkeley County Sheriff's Office for attempted murder of police officers. EPD&VCTF investigators did not recover narcotics during the aforementioned search warrant and believe that HALLACK may have destroyed drug evidence

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 51 of 68   PageID #: 70

during the extended "stand-off" period with law enforcement officers that lasted for approximately forty-five minutes.

71. In any case, it is unlikely that the use of search warrants, in and of themselves, would meet the goals and objectives of this investigation. Evidence seized would only implicate the individual directly associated with it, and not the entire organization. Finally, in order to achieve maximum effectiveness, a search warrant must be coordinated with information concerning the immediate whereabouts of the sought-after evidence. This is best achieved with the interception of communications. Intercepted communications can inform investigators of the immediate presence of drugs, weapons or other contraband in a timely manner. A search warrant could then follow. The use of these two techniques in conjunction with one another is the most effective way to seize contraband, secure evidence, and ultimately provide evidence against gang members, which will disrupt or dismantle their criminal organization.

72. In addition, using subpoenas or warrants to compel the service provider to obtain stored copies of previously sent or received electronic communications is not an adequate substitute for real-time interception. The service providers do not retain historical copies of the electronic communications and as such, real time interception of electronic communications is necessary to allow investigators to make timely use of the information that may relate to an imminent delivery of contraband or conduct in furtherance of the TARGET OFFENSES.

### Interviews/Grand Jury Subpoenas/Immunity

73. Interviews have been conducted during the course of the investigation that have been effective in gathering information on the membership and operation of the DTO. Some of the interviews have also led to the recruitment of a few of the aforementioned confidential sources who have been used during this case.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 52 of 68   PageID #: 71

However, as described above, those confidential sources have taken this investigation as far as it can go, and it is short of meeting the investigation's prosecutorial goals and objectives. Additionally, other attempts at interviewing DTO members have proven entirely futile.

74. On February 7, 2019, VINCENT was interviewed during the execution of the search warrant noted previously in this affidavit. VINCENT advised the narcotics which were in the possession of ALVIN in the vehicle during his arrest, were supplied to him by "Wave", known by investigators to be RICHARDSON, but could not provide a true name for "Wave." VINCENT was not forthright with information related to follow up questions regarding "Wave" to include but not limited to, the location of his residence, type of vehicles used, and telephone number. VINCENT also provided deceptive information to investigators regarding ALVIN's role in the aforementioned drug related homicide and her own role as part of the DTO that ALVIN was involved with. The information provided by VINCENT to investigators was inadequate to further the investigation as she was not able to provide a true identification of RICHARDSON, the hierarchy of the DTO, methods used to traffic narcotics into West Virginia, methods used by the DTO to conceal drug proceeds, and other listed goals of this investigation. The EPE&VCTF made a controlled purchase of $100 worth of heroin from VINCENT on February 8, 2019 and arrested her immediately following the controlled drug buy. Investigators attempted to interview VINCENT again subsequent to the February 8, 2019 arrest however she was not cooperative and would not provide any additional information regarding her source of heroin supply. The interviews of VINCENT failed to further the investigation of this DTO and achieve the goals set forth in this affidavit.

75. Subsequent to ALVIN's arrest on February 7, 2019, ALVIN was taken to the Martinsburg Police station for further questioning where he provided investigators with a verbal confession to the murder which had occurred on

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 53 of 68   PageID #: 72

February 3, 2019.   ALVIN did not discuss the hierarchy of his DTO, did not provide investigators with any intelligence related to the methods used to conceal drug proceeds, locations of stash houses, or methods used to traffic narcotics into West Virginia.   ALVIN advised that he was confessing to the murder only in an effort to protect VINCENT who was pregnant with their child.   The interviews of ALVIN failed to further the investigation of this DTO and achieve the goals set forth in this affidavit.

76. Attempting to interview additional persons associated with this investigation would also have the effect of alerting the TARGET SUBJECTS and others, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.   Additionally, if the TARGET SUBJECTS are alerted to the government's investigation, they may flee the jurisdiction in order to avoid apprehension and prosecution.

77. Based upon my training and experience, I do not believe a Grand Jury investigation using subpoenas would be successful for the following reasons:

    a.    subjects of the investigation, such as RICHARDSON, ALVIN, VINCENT, HESS, MOSBY, BRAHEEM, JENKINS and THEODORE, YOUNG if called to testify, would most likely invoke their Fifth Amendment privileges;

    b.    it would likewise be unwise to seek Grand Jury immunity for any of the subjects as it might foreclose prosecution of the most culpable people; and

    c.    most of the individuals who have been identified in this investigation participate in various forms of illegal activities

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 54 of 68   PageID #: 73

and would likely lie under oath unless confronted with facts that would force them to tell the truth.

78. Currently, I am not aware of any person who could be subpoenaed before the Grand Jury or interviewed who would provide significant and truthful evidence to prove the on-going suspected crimes identified in this affidavit. Moreover, the use of Grand Jury techniques, like search warrants described above, would alert RICHARDSON, BRAHEEM, THEODORE, HESS, MOSBY, YOUNG, JENKINS and their co-conspirators, both known and unknown, to the existence of this investigation. At a minimum, this would lead RICHARDSON and his co-conspirators to be more circumspect in their dealings. Thus, I believe that these techniques, in particular, are likely to impede the government's investigative objectives at this time.

79. Subsequent to the arrest of HALLACK, EPD&VCTF officers did not attempt to interview him since he was placed under arrest for attempted murder of law enforcement officers and not a narcotics violation. Additionally, investigators believe that an attempt to interview HALLACK regarding his involvement with narcotics and/or his knowledge of RICHARDSON would most likely have jeopardized the ongoing investigation of RICHARDSON and his criminal organization.

80. Subsequent to the arrest of YOUNG, EPD&VCTF officers did not attempt to interview YOUNG since he had informed the arresting officers that he did not know the contents of the "milk jug" container that was removed from his vehicle during the 09/13/2019 traffic stop noted previously in this affidavit. Intercepted communications occurring over **TT2** between RICHARDSON and YOUNG reveal that YOUNG was aware of the substance and thus was attempting to thwart the arresting officers by being untruthful. Additionally, EPD&VCTF officers did not

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 55 of 68   PageID #: 74

attempt to interview YOUNG as doing so would jeopardize the investigation by revealing law enforcement's awareness of RICHARDSON's residence and drug activity occurring at RICHARDSON's residence. Alerting RICHARDSON would most likely cause him to discontinue his use of **TT2** and hinder law enforcement efforts to identify RICHARDSON's source of heroin and crack cocaine.

## Trash Searches

81. EPD&VCTF investigators did not attempt to conduct a trash pull at RICHARDSON's residence for reasons similar to those noted in the difficulty in conducting physical surveillance of the residence. RICHARDSON's residence is located in a remote area and he has demonstrated his awareness of activity occurring in the front of the residence to include vehicles driving by the residence. RICHARDSON's trash cans are located in an area where attempting to retrieve the trash would require investigators to trespass on his property and risk detection. Furthermore, trash searches are not effective in fully identifying the participants and scope of a narcotics conspiracy. Narcotics trafficking is not a document intensive crime, so although trash searches may reveal the phone numbers and monikers of some conspirators, or the occasional writing related to the finances behind a particular drug transaction, they will not fulfill the goals of this investigation. For these reasons, along with the aforementioned complications associated with the location where RICHARDSON resides, a trash search was not attempted.

## Attempted Use of Other Surveillance Techniques

82. In or around March 2019, investigators learned that RICHARDSON was being monitored by the West Virginia Probation Office by way of GPS ankle monitoring

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 56 of 68   PageID #: 75

device, as a condition of his probation status. Between March 2019 through approximately June 2019, RICHARDSON was only authorized by the probation office to have regular travel to and from his residence on Hostler Road, Harpers Ferry and his clothing store located in Ranson, WV. Additional conditions set by the probation office, to include authorized travel to grocery stores and family visits in areas other than his residence, were monitored by the West Virginia Probation Office. EPD&VCTF investigators do not have regular access to the system used by the probation office to monitor RICHARDSON's ankle monitor. No requests have been made by the EPD&VCTF to obtain access to the captioned monitoring system because doing so would most likely require a search warrant and would divulge the investigation to additional individuals that would make maintaining operational sensitivity unnecessarily difficult. Additionally, RICHARDSON did not appear to violate the restrictions set by the probation office based on the fact that restrictions were lifted in or around July 2019 to allow RICHARDSON to travel freely within Berkeley County and Jefferson County, WV.

83. On April 10, 2019, the EPD&VCTF established fixed video surveillance at a clothing store, "Fashion Factory" located at the intersection of 101 S. Mildred Street Ranson, WV. The store was identified by investigators as belonging to RICHARDSON through business records and confirmed through RICHARDSON's social media account identified on Facebook. The fixed video surveillance unit allowed investigators to observe RICHARDSON arriving at the store, leaving the store, and at times, meeting with individuals outside of the store. During times where RICHARDSON was observed to meet with individuals outside of the store, investigators were not able to confirm the purpose of the meetings, content of the meetings, or allow investigators to accomplish the goals of this investigation and dismantle this organization.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 57 of 68   PageID #: 76

84. On June 26, 2019, the EPD&VCTF sought and obtained a GPS geolocation search warrant in the Northern District of West Virginia (3:19MJ81) for BRAHEEM's cell phone (CP2). The GPS locations received from CP2 although useful in monitoring the general location of BRAHEEM's phone, fail to provide investigators with the nature or purpose of travel to specific locations. Additionally, the locations provided often times have a margin of error that places the phone (CP2) within an area that is too large for investigators to locate BRAHEEM in a timely manner and observe meeting locations or persons with whom he meets with. Physical surveillance coordinated with GPS geolocation information from CP2 has revealed that BRAHEEM has traveled several times to RICHARDSON's residence and then back to Martinsburg, WV. However, this information does not allow investigators to determine the nature of the meetings between BRAHEEM and RICHARDSON or allow investigators to accomplish the goals of this investigation and dismantle the DTO.

85. On July 2, 2019, the EPD&VCTF established fixed video surveillance at RICHARDSON's residence located at                    Harpers Ferry, WV. The fixed video surveillance location point only allowed investigators to observe a section of the middle of RICHARDSON's driveway. Investigators were not able to use the fixed video surveillance to observe the front of RICHARDSON's house or the area where RICHARDSON parks his vehicles. Because investigators are not able to use the fixed video surveillance location at RICHARDSON's residence to observe activity that occurs inside or near the residence, this fixed surveillance location fails to accomplish the goals of this investigation and dismantle this organization.

86. On September 5, 2019, the EPD&VCTF sought and obtained a search warrant (3:19·MJ·104) in the Northern District of West Virginia, to collect precision location data associated with the cell phone being utilized by YOUNG (CP16).

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 58 of 68   PageID #: 77

The collection of this precision location data assisted investigators in locating and arresting YOUNG subsequent to picking up the "milk jug" of liquid PCP from RICHARDSON's residence. Although arresting YOUNG removed RICHARDSON's supplier of PCP, YOUNG has not been determined to be RICHARDSON's source of heroin or crack cocaine. As such, the arrest of YOUNG did not accomplish the goals of this investigation to ultimately dismantle RICHARDSON's drug trafficking organization. Investigators believe that continued interception of TT2 will ultimately reveal RICHARDSON's sources of heroin and crack cocaine and thus are seeking authority for continued interception of the TARGET TELEPHONE.

87. On September 9, 2019, the EPD&VCTF sought and obtained search warrants (3:19-MJ-109 and 3:19-MJ110) in the Northern District of West Virginia, to place GPS tracking devices on two vehicles observed to be operated by RICHARDSON while engaging in drug distribution activities. A GPS tracker was successfully installed by the EPD&VCTF on a Toyota 4-Runner, operated by RICHARDSON, on September 10, 2019 in Martinsburg, WV. Investigators have been able to use the installed GPS tracker to monitor general direction of travel engaged in by RICHARDSON while operating the Toyota 4-Runner. Additionally, the EPD&VCTF has learned of a location in Martinsburg, WV where RICHARDSON is attending a barbering school. The identification of the barber school location was obtained via physical surveillance conducted through coordinated use of the data obtained from the GPS tracking device installed by the EPD&VCTF. The tracking device has not allowed investigators to confirm RICHARDSON's purpose for travel, who he meets with to obtain narcotics for further re-distribution, or the location of his stash house(s). Furthermore, the GPS tracking device provides investigators with an approximate location of RICHARDSON's vehicle yet not an exact location. The tracking device does not allow investigators

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 59 of 68   PageID #: 78

to determine RICHARDSON's location during times when he exits his vehicle to travel on foot or in another vehicle other than the monitored Toyota 4-Runner.

88. On July 30, 2019, the EPD&VCTF sought and obtained a GPS geolocation search warrant in the Northern District of West Virginia (3:19MJ89) for RICHARDSON's cell phone (**TT2**). Collection of GPS geolocation information was authorized to continue after being sought and obtained in conjunction with interception of wire and electronic communications of **TT2** (3:19-MC-33), authorized on 08/27/2019. The GPS locations received from **TT2** although useful in monitoring the general location of RICHARDSON's phone, fail to provide investigators with the nature or purpose of travel to specific locations. Additionally, the locations provided often times have a margin of error that places the phone (**TT2**) within an area that is too large for investigators to locate RICHARDSON in a timely manner and observe meeting locations or persons with whom he meets with. Therefore, I do not believe the use of alternative surveillance equipment, even if successful, would satisfy the goals and objectives of the investigation. Location information for **TT2** is being sought in conjunction with the instant application.

### Pen Registers, Trap and Trace Devices, Toll Analysis and Subscriber Information

89. Court orders have been issued authorizing the installation and use of a pen register and trap and trace device on the TARGET TELEPHONE and other telephones related to this investigation. Agents in this investigation will continue to use pen registers, trap and trace devices, and toll record analysis during this investigation. Pen register and toll information provide frequency and identifying information regarding calls made from a particular telephone. This technique, however, will only provide agents with a list of numbers called and will not establish the identities of all the persons called or the contents of the

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 60 of 68   PageID #: 79

conversations. Moreover, based on my training and experience, I know that narcotics traffickers often subscribe to telephones in fictitious names or use the names of family members and other associates when subscribing to phone service in an effort to thwart law enforcement investigation of their illegal activities.

90. A trap and trace device is simply a complement of a pen register device. It identifies the telephone number of any telephone that has dialed the subject phone, but it is also subject to the same limitations of a pen register. For all the reasons stated above, pen register and trap and trace devices and toll analysis are all valuable investigative tools, but will not by themselves achieve the goals of the government's investigation.

## Mail Cover Requests

91. "Mail covers" are a service provided by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target location, and then the list would be provided to a United States Postal Inspector, who would provide the list to the EPD&VCTF investigators. In April 2019, a thirty-day mail cover was requested by the EPD&VCTF. The thirty-day male cover initiated 05/28/2019, ended on 06/26/2019, and covered individuals receiving mail at RICHARDSON's residence Harpers Ferry, WV. The mail cover yielded no information pertinent to this investigation and, therefore, was not effective in satisfying the goals of this investigation.

92. On April 25, 2019, the EPD&VCTF obtained an administrative subpoena for Federal Express (FedEx) and United Postal Service (UPS) to obtain delivery information for packages received at RICHARDSON's residence, Harpers Ferry, WV and at RICHARDSON's "Fashion Factory" store located

at 101 S. Mildred Street Ranson, WV.   The subpoena allowed investigators to review tracking label information for packages delivered by FedEx and UPS. FedEx tracking information was obtained between the dates of 04/01/18 through 05/21/19.   UPS tracking information was obtained between the dates of 04/01/2018 through 04/24/2019.   On 05/22/2019 the EPD&VCTF obtained an administrative subpoena to capture tracking information for packages delivered to RICHARDSON's residence via "FedEx Ground."   FedEx Ground tracking information was obtained for the dates of 04/01/2018 through 04/24/2019.   The subpoena responses yielded no information pertinent to this investigation and, therefore, were not effective in satisfying the goals of this investigation.

## Other Wiretaps

93. On 11/06/2018, the United States District Court for the Northern District of West Virginia issued an order (3:18MJ103) authorizing the interception of wire and electronic communications to and from a cellular telephone bearing the number 240-586-3412, used by ARMSTEAD CRAIG.   Interceptions terminated on 12/05/2018.   CRAIG, ARAMBURO, and JENKINS were intercepted over the phone.   JENKINS was identified as a drug "tester" in the previous EPD&VCTF investigation known as OPERATION TRIPLE CROWN.   JENKINS has been observed as a driver of ARAMBURO during a controlled drug purchase conducted by the EPD&VCTF in the instant investigation. Furthermore, the investigation conducted by the EPD&VCTF of CRAIG and ARAMBURO which involved the use of wire and electronic interception was insufficient in allowing investigators to fully achieve the goals of the instant investigation.   Specifically, RICHARDSON was not intercepted over telephones being utilized by CRAIG and ARAMBURO and thus the EPD&VCTF was not able to identify RICHARDSON's source of drug supply, stash house locations, methods of trafficking narcotics between states, or hierarchy of RICHARDSON's drug trafficking organization.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 62 of 68   PageID #: 81

94. On 08/27/2019, the United States District Court for the Northern District of West Virginia issued an order (3:19-MC-33) authorizing the interception of wire and electronic communications to and from **TT2**. Your affiant is requesting the affidavit approved during the authorization of 3:19-MC-33 be incorporated into this instant affidavit.   Voice and electronic interception of **TT2** began on 08/27/2019 and is scheduled to terminate on 09/26/2019.   Interceptions thus far occurring over **TT2** have been productive in allowing investigators to confirm that RICHARDSON is supplying other subjects, such as HESS, with redistributable amounts of heroin and crack cocaine.   Additionally, these interceptions have revealed to investigators that RICHARDSON is in possession of a large quantity of liquid PCP and is attempting to distribute PCP in the Northern District of West Virginia.   The interceptions of **TT2** to date, have not yet revealed the hierarchy of RICHARDSON's drug organization.   Interception of **TT2** has yet to reveal a stash house location for RICHARDSON's drug supply.   Furthermore, investigators have not learned the identity of RICHARDSON's source of heroin and cocaine supply.   Although interceptions of **TT2** reveal RICHARDSON's suspected source of drug supply is most likely in New Jersey, the identity of the drug supplier has not yet been revealed to investigators.   RICHARDSON has yet to make a communication over **TT2** that indicates that he is low on drug supply and needs to resupply with his source.   It is anticipated that RICHARDSON will need to resupply with heroin and cocaine during an authorized extension period for interception of **TT2**.

## Financial Investigation

95. Money laundering is not an alleged target offense at this point in the investigation. Investigators are aware that RICHARDSON makes frequent visits to the Charles Town Casino in Charles Town, WV and it is believed that drug proceeds are most likely used during times when RICHARDSON gambles. However, investigators cannot confirm at this time that RICHARDSON is using

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 63 of 68   PageID #: 82

the casino to launder his money. Investigators feel that interception of his voice and electronic communications occurring over **TT2** would reveal his purpose of travel to the casino and the nature of the meetings that he has while visiting the casino.

## MINIMIZATION

96. All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the date of the court's Order. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the TARGET INTERCEPTEES or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

97. In the event that an intercepted conversation is in code or foreign language, and an expert in that foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the government, will be under the direct supervision of a federal agent.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 64 of 68   PageID #: 83

98. If, however, a translator is not reasonably available, the following after-the fact minimization procedures have been established, pursuant to Title 18, United States Code, Section 2518(5):

    (a)    all such foreign language conversations will be intercepted and recorded in their entirety;

    (b)    as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent authorized to conduct the interception, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

99. All monitoring of electronic communications will be conducted in accordance with Chapter 119 of Title 18, United States Code. Each electronic communication (i.e. text message) will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's Order authorizing the interception. It is anticipated that the monitoring location will

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 65 of 68   PageID #: 84

not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

100.   Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through receipt from the service provider of "packet data," an electronic data stream. That packet data stream, pursuant to CALEA, will be delivered to FBI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through FBI's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, FBI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded. In the rare event that a voice call is not filtered out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and FBI will preserve and seal such communications in the manner used for other intercepted electronic communications.

## GEOLOCATION INFORMATION

101.   In addition, there is probable cause to believe that the location of the TARGET TELEPHONE at times determined by investigators during the authorized period of interception, and information regarding the location of the TARGET TELEPHONE during the 60 days preceding the date that the order is entered (the "Requested Location Information"), will constitute evidence of the TARGET OFFENSES.

102.   As documented previously in this affidavit investigators learned that RICHARDSON was being monitored by the West Virginia Probation Office by way of GPS ankle monitoring device, as a condition of his probation status. Between March 2019 through approximately June 2019, RICHARDSON was only authorized by the probation office to have regular travel to and from his residence on Hostler Road, Harpers Ferry and his clothing store located in Ranson, WV. Additional conditions set by the probation office to include authorized travel to grocery stores and family visits in areas other than his residence, were monitored by the West Virginia Probation Office.  EPD&VCTF investigators do not have regular access to the system used by the probation office to monitor RICHARDSON's ankle monitor.  No requests have been made by the EPD&VCTF to obtain access to the captioned monitoring system because doing so would most likely require a search warrant and would divulge the investigation to additional individuals that would make maintaining operational sensitivity unnecessarily difficult.  Additionally, RICHARDSON did not appear to violate the restrictions set by the probation office based on the fact that restrictions were lifted in or around July 2019 to allow RICHARDSON to travel freely within Berkeley County and Jefferson County, WV.

103.   EPD&VCTF investigators have yet to determine RICHARDSON's travel routines throughout the Eastern Panhandle of West Virginia.  As stated previously, knowledge of the presence of an ankle monitor on RICHARDSON's person does not allow investigators to access his location information on an as

66

needed basis without divulging the existence of this investigation to additional entities that are not necessarily involved in this investigation. Furthermore, prospective (real-time) location information provided by the service providers would allow investigators to monitor RICHARDSON's movement in and around Berkeley and Jefferson Counties in an effort to develop possible "stash house" locations, proximity to gang related violent acts that occur, or meeting locations where the DTO conducts drug resupply activity.

104.   Probable cause continues to exist for the acquisition of prospective (real-time) location information as evidenced in the multiple controlled purchases of crack cocaine and heroin conducted by the EPD&VCTF from RICHARDSON. The captioned controlled drug buys have demonstrated RICHARDSON's ability to acquire large redistributable quantities of crack cocaine and heroin from a source that has yet to be identified. The EPD&VCTF has reviewed jail recorded telephone calls between ALVIN and RICHARDSON in which RICHARDSON describes traveling to New Jersey. The referenced jail calls were consensually recorded by the Eastern Regional Jail. Inmates were advised prior to conducting all calls, via recorded message, that their conversations might be monitored or recorded. Investigators are aware that RICHARDSON is from the Camden, NJ area and has family connections to the region. Prospective (real-time) location information obtained from RICHARDSON's TARGET TELEPHONE would allow investigators to obtain information regarding his route of travel and destination of travel.

## JURISDICTION

105.   Pursuant to 18 U.S.C. § 2518(3), in the event that the TARGET TELEPHONE is used outside the territorial jurisdiction of this Court, interceptions may continue in the Northern District of West Virginia, where communications over the TARGET TELEPHONE will first be heard and/or read and minimized.

Case 3:19-mc-00043-GMG *SEALED*   Document 1-3   Filed 09/23/19   Page 68 of 68   PageID #: 87

## CONCLUSION

106.     Based upon my training and experience, including my participation in this investigation, I believe that probable cause exists that the TARGET SUBJECTS and others known and unknown are involved in a continuing criminal conspiracy involving narcotics trafficking.  As detailed above, normal investigative techniques have yielded limited success with regards to identifying all the members of the DTO, including suppliers and customers of the DTO throughout the Eastern Panhandle of West Virginia area, as well as in other states.  Therefore, continued interception over the TARGET TELEPHONE is necessary and permission is hereby requested to continue interception of wire and electronic communications of the TARGET SUBJECTS, and any other co-conspirators later identified, over the TARGET TELEPHONE for an additional thirty-day period.

Jeffrey Cisar
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me, this 23rd day of September, 2019,

UNITED STATES DISTRICT COURT JUDGE